IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES,<br><br>                     v.<br><br>BARRY WILLIAMS,<br><br>                     Defendant. | Criminal Number 3:08CR376 |

## **MEMORANDUM OPINION**

THIS MATTER is before the Court on a motion to suppress statements made and evidence seized after an investigatory stop of the defendant by two Richmond Redevelopment and Housing Authority Police officers. For the reasons below, this Court DENIES Defendant's Motion, as the investigatory stop was constitutional; therefore, subsequent evidence seized and statements made were lawfully obtained.

### I. BACKGROUND

On July 3, 2008, at approximately 8:00 p.m., Officer Reynolds and Corporal Spann of the Richmond Redevelopment and Housing Authority Police ("RRHAP") were on a walking assignment on Raven Street in Richmond, Virginia. The officers received a radio call regarding an anonymous 911 tip stating that a black man, wearing a white shirt, blue jeans, and black shoes, had a gun in the 1900 block of Raven Street. The call further stated that the individual was sitting on a porch showing the gun to someone and placed it in his shirt. Officer Reynolds and Corporal Spann, who were in the area, went in search of the suspect.

Approximately one minute after receiving the tip, Officer Reynolds encountered Mr. Williams at the entrance to Raven Street. Mr. Williams matched the description of the armed party. The area where the "defendant was encountered is in the Mosby Court Housing Complex, a high-drug, high-crime area, that is inundated with trespassers." (Resp. to Def.'s Mot. to Suppress 2.) The streets within the Complex are privatized, and the Richmond Police Department is charged with ensuring that non-resident trespassers are excluded from the area. In this capacity, RRHAP is authorized to enforce the trespass policy.[1]

Officer Reynolds, who is familiar with almost all of the lawful residents of the Complex, and who has personally made over one hundred arrests for trespassing in the area, did not recognize Mr. Williams as a resident. Upon approaching Mr. Williams, Officer Reynolds asked the defendant whether he was authorized to be in the area and whether he had identification. Williams refused to provide any information and repeatedly asked why he was being stopped. Officer Reynolds continued to ask for identification, at which time Mr. Williams stated that he lived at 1936 Raven Street and was "just visiting." (Resp. to Def.'s Mot. to Suppress 2.) During this conversation, Corporal Spann approached the defendant from behind.

---

[1] The no trespassing policy "authorize[s] the city's police to serve a notice on any person who [i]s found on housing-authority property, when such a person [i]s not a resident or employee and can not demonstrate a 'legitimate business or social purpose' for being on the premises; (2) provide[s] that such notice (a 'barment notice') would forbid the person from returning to the property; and (3) authorize[s] the city's police to arrest any person for trespassing after such person, having been duly notified, either stayed upon, or returned to, housing-authority property." Virginia v. Hicks, 539 U.S. 113, 122-23 (2003).

As Officer Reynolds pulled out a notepad to write down Mr. Williams' information, the defendant dropped a plastic bag, turned, and "began a headlong flight away from Officer Reynolds," running into Corporal Spann.  (Resp. to Def.'s Mot. to Suppress 2.)  Corporal Spann tried to detain the defendant, who resisted.  Ultimately, Corporal Spann, Officer Reynolds, and two Richmond Police Department officers, who arrived shortly after Corporal Spann, placed Defendant into investigative detention.  After he was taken into custody, Officer Perez of the Richmond Police Department retrieved the bag Mr. Williams dropped and found a .45 caliber revolver wrapped inside a black t-shirt.  Subsequently, Officer Reynolds verified that the defendant was a felon, and had been banned from the property on June 5, 2008.  Mr. Williams was then Mirandized and placed under arrest.

## II. DISCUSSION

### A.     The "Reasonable Suspicion" Standard

The Fourth Amendment safeguards the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures."  U.S. Const. amend. IV.  A "seizure" occurs if a law enforcement officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968).  The totality of the circumstances surrounding the seizure must be considered to determine whether "a reasonable person would not feel free to leave or otherwise terminate the encounter."  United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002).  Accordingly, an officer does not violate the Fourth Amendment merely by approaching a citizen on the street or in another public place, so long as a reasonable person would feel free "to disregard the police and go about his

business." Florida v. Bostick, 501 U.S. 429, 434 (1991).  Similarly, being questioned by an officer or being asked for identification– by itself– "is unlikely to" constitute a seizure on the ground that the interaction is assumed to be consensual.  I.N.S. v. Delgado, 466 U.S. 210, 216 (1984).

     A seizure must be justified by probable cause.  Dunaway v. New York, 442 U.S. 200, 207–211 (1979).  Probable cause exists if the facts and circumstances within an officer's knowledge warrant a prudent person, or one of reasonable caution, to believe that the suspect has committed, is committing, or is about to commit an offense.  Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).  However, an officer may conduct an investigatory stop–a brief seizure– if he has "a reasonable, articulable suspicion that criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000); accord United States v. Reaves, 512 F.3d 123, 126 (4th Cir. 2008).

     Whether the facts give rise to a reasonable and articulable suspicion must be judged objectively, i.e., whether a "man of reasonable caution" in the shoes of the police officer, given the facts, would believe the investigatory detention was appropriate.  Terry, 392 U.S. at 20; Wardlaw, 528 U.S. at 124 ("Headlong flight-wherever it occurs, is the consummate act of evasion: It is not necessarily indicative of wrong-doing, but is certainly suggestive of such."); United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (internal citation omitted) (noting that the "practical experience of the officers" is another factor that may raise the level of suspicion).  While the police may rely on an anonymous tip to support reasonable suspicion, the tip must be accompanied by some corroborative elements that establish the tip's reliability.  United States v. Reaves, 512 F.3d 123, 126 (4th Cir. 2008).

**B.      The Officers Had Reasonable Suspicion to Stop Defendant**

Defendant argues the initial conversation between himself and Officer Reynolds was an investigatory stop because the officer continuously requested his identification, all the while Corporal Spann was approaching him from behind.  The defendant contends this establishes he was not free to leave.  Further, Mr. Williams argues this investigatory stop was unlawful because the officers had no reasonable or articulable suspicion that he had engaged in criminal activity–he simply matched the "bare-bones description" of an anonymous tip.  In contrast, the Government contends the officers approached Mr. Williams and questioned him regarding his right to be on the property, and this mere questioning was not an investigatory stop.  The Government further asserts that an investigatory detention took place only after Mr. Williams dropped the package and fled, and that reasonable suspicion existed at this time because of Mr. Williams' conflicting story suggesting he both lived on Raven Street and was "just visiting," his matching the description of the anonymous tip, and his headlong flight, which is suggestive of wrong-doing.  This Court agrees.

Officer Reynolds' initial conversation with Mr. Williams does not meet the requirement of a "seizure."  The officer merely asked the defendant for identification, and did not show force, restrain the defendant, or otherwise prohibit him from leaving.  Based on these facts, a reasonable person would believe they were free to leave or otherwise able to terminate the conversation.  Therefore, an investigatory stop had not taken place at this stage and Officer Reynolds did not need to have a reasonable and articulable suspicion that a crime had occurred.  However, after the defendant dropped

the bag he was holding and took off running, the officers had reasonable suspicion that criminal activity was afoot. This act of fleeing, coupled with the anonymous tip, the defendant's presence in a high-drug, high-crime area, and Officer Reynold's experience, which led him to believe Mr. Williams was a trespasser, provided the officers with reasonable suspicion to institute an investigatory detention. Once Mr. Williams was detained, the officers retrieved a gun from the bag Defendant dropped, and verified that Mr. Williams was a felon and had been banned from the property. The officers then had probable cause to arrest the defendant. At this time Mr. Williams was Mirandized, and therefore any subsequent questioning or search of the defendant did not violate the Fourth Amendment.

### III.  CONCLUSION

Officer Reynolds initial conversation with Mr. Williams was not an investigatory detention, and therefore did not require the officer to have reasonable and articulable suspicion of criminal activity to approach the defendant. However, after the defendant dropped a package and fled, the officers had reasonable suspicion to believe that criminal activity was afoot, and therefore the subsequent investigatory detention and retrieval of the gun was lawful. Accordingly, this Court DENIES Defendant's Motion to Suppress.

        /s/
James R. Spencer
Chief United States District Judge

Entered this   25th   day of November 2008